No. 12,438.

A. S. BADGER, RECEIVER OF THE SOUTHERN CHEMICAL AND FER-TILIZING COMPANY, LIMITED, vs. THE CITY OF NEW ORLEANS.

The creditor of the city, whether by contract or otherwise, can not, because he is left off the budget, enjoin an appropriation on the budget for a legitimate municipal purpose, to which appropriation he conceives he is entitled under his contract, but the city treating the contract as void. 2 High on Injunctions, Sec. 1402 *et seq.*

*Mandamus* is the remedy to compel the performance of simple ministerial duties imposed by law, but the writ can not be used to enforce disputed claims alleged to arise under contract, the validity and performance of which are denied and controverted in a litigation when the *mandamus* issues. C. P., Art. 829 *et seq.;* High on Extra Rems., Secs. 25, 321, 339; 16 S. and R., p. 17.

Appropriations on the budget of the city of New Orleans, proposing payments out of the revenues of the year of debts and liabilities of previous years, are illegal, and payments under such appropriations may be enjoined by any party in interest. City Charter, Act 20 of 1882, Sec. 64; Act No. 45 of 1894, Sec. 93; 43 An. 464; 39 An. 938.

*Breaux, J., concurring:* Weighing the extent of the injury which the relator will suffer if the order be withheld, and. the consequence to the opposite party if the order be granted, in my mind, within its discretionary power, the court can grant or withhold the relief sought, according to the exigencies in the case, particularly for the reason that the writ of injunction applied for must serve, as far as possible under the circumstances, to safeguard whatever right the relator may have.

A court may grant a writ of injunction to preserve a right in *statu quo* for a limited time, in order that it may be litigated.

The city should not be enjoined from paying a needful amount to perform a task of greatest importance, nor should the city be compelled by writ of *mandamus* to withhold the whole amount budgeted for to meet the expenses of removing the garbage.

*Watkins, J., dissenting—Blanchard, J., concurring in the dissent:* The controversy is one for the control of an existing appropriation in the annual budget for the removal of garbage during the current year 1897, the relator claiming under a contract, the city disavowing the contract, claiming for itself.

If the *mandamus* is not peremptory the city, through the Department of Public Works, will [be necessarily excluded from the use of the garbage fund when collected; if denied, the garbage company will be forced to discontinue its collection.

The city has not the right, summarily, to displace a contractor in the manner proposed, and it is equally evident that it can be coerced to perform a plain ministerial duty of budgeting relator's claims as provided in the ordinance.

APPEAL from the Civil District Court for the Parish of Orleans. *King, J.*

*Farrar, Jonas & Kruttschnitt* for Plaintiff, Appellee.

*Samuel L. Gilmore,* City Attorney, for Defendant, Appellant.

Argued and submitted March 6, 1897.
Opinion handed down April 12, 1897.

The opinion of the court was delivered by

MILLER, J. The Relator demands that this court order the city of New Orleans to place upon its budget of expenses for the year 1897, to be paid from the yearly revenues, one hundred and twenty thousand dollars claimed by the relator for the company he represents, under its contract for removing the garbage of the city; the contract having been entered into in 1893 for the period of twenty years, with stipulated payments of ten thousand dollars per

month to be provided for in the annual budgets.   Pending the application for the injunction, the city prepared and published its budget, omitting the company, but placing in the  proposed annual expenditures one hundred and twenty thousand dollars for removing garbage, and thereafter the relator obtained an  injunction, prohibiting the city from disposing of the one hundred and twenty thousand dollars and other items on the  budget, to the prejudice of his demand for payment out of the revenues of 1897.   The City answered, averring the nullity and *non*-performance of the garbage contract, and prosecutes this appeal from the judgment in relator's favor.

The demands of the relator are modified in argument, and instead of payment he asks that the amount he claims be put on the budget as accruing to him, or that the amount now on it for garbage removal be ordered to be retained until the relator's rights be determined in suits to be brought by the city or by him.   The City in argument urges the invalidity and *non*-performance of the garbage contract and relies on the  resolution of the council declaring the contract null.   It is brought to our notice, too, that there is a pending suit in the United States Circuit Court brought by the  relator asserting his right under the contract, and in which suit the city relies on its defences.   It is thus manifest the binding  obligation of the garbage contract is controverted by the city,  and is at issue in the pending litigation in the Circuit Court.

Modified as are the demands by the argument, it is clear that the relief he asks at our hands is in aid of the contract obligation he asserts, disputed as is the obligation by the city through its council and in the courts.   If we give the relief we place at the relator's disposal, should  he  eventually obtain judgment, the amount he claims under his contract; we take from the city to the same extent the control of its budget and the control of its revenues required for the municipal functions.   If we give this relief we necessarily give a disputed  contract  recognition, and  make  provision to secure performance by the city.   The question confronts us at the outset, whether by *mandamus*, restricted as it is to enforce purely ministerial duties, with all the aid afforded by the injunction, we can make obligatory on the City even to the extent claimed an alleged contract the existence of which is denied, and force the City to place on its budget the amount it refuses to recognize.

In our present discussion we deal first with the  proposition to en-

join the City from disposing of the one hundred and twenty thousand dollars now on the budget for garbage removal, not put there for the garbage company, but to be expended by the city through its ordinary instrumentalities for the removal of garbage. All can. appreciate that items placed on the budget for the specific purposes stated may be protected from diversion by the parties in interest. It is equally appreciable that funds placed on the budget, destined by law to the satisfaction of a class of creditors, may by injunction be preserved from any application to any other class. See the case of Barber Asphalt Paving Company vs. City of New Orleans, 43 An. 464, and other cases of that type. But in this case there is no provision whatever on the budget for the relator. What is asked in effect is, that the injunction shall restrain the application of an amount which is on the budget, but not for him, to which he conceives he is entitled and should, in his judgment, be allotted to him. Under the form of an injunction, he, in effect, asks that provision be made for him on the budget, not, it is true, that it shall be ordered paid to him, but none the less, that it shall be placed and retained on the budget to abide his rights. We think it must be recognized as familiar, that creditors can not in advance of judgment with exceptions unnecessary to be stated, enjoin the disposition of the debtor's property. In Mr. High's comprehensive chapter on the subject of injunctions to municipal corporations he has exhibited the uses of the writ. The misappropriation of municipal funds is, of course, prominent in his discussion. Thus, he instances appropriation of county funds in aid of a private corporation without authority of law; donations without legal authority for school houses; the disposition by county commissioners of the surplus revenues in an illegal and unauthorized manner, and similar cases are stated by him as affording the basis of an injunction. But there is no recognition in the chapter, of an injunction of a creditor to restrain the disposition of the corporate funds. As to creditors we understand the general principle to be that injunction to restrain the debtor's control of his property can not be obtained. "It is to be observed, however, that the jurisdiction (i. e., of injunction in behalf of creditors) is not exerted in favor of mere contract creditors, or creditors at large, whose claims are not reduced to judgment, and in the absence of statutory provisions authorizing the relief courts will not interfere by injunction to

restrain the debtor from any disposition of his property, however fraudulent the disposition he may seek to make," etc. 2 High, Chapter 27. The answer that the creditor of the city of New Orleans dependent on the annual revenues for his payment and with a contract right to that payment is not a "mere contract creditor" does, in our view, withdraw him from the general principle announced by the text writer. Every creditor of the city for labor, supplies, or in other respects, is entitled by law to be placed on the budget for the year in which his debt accrues, but that, in our view, would not, if he were omitted, entitle him to an injunction to restrain the City from making provisions on its budget for the annual expenses of municipal government. Hard as his condition might be if omitted, he could claim no such injunction as is asked for at our hands, but would be remitted to other relief. Again, in exceptional cases, it is the judgment creditor on whose behalf the injunction, issues to restrain the debtor's disposition of his property. The judgment establishes his right. Here, it is asked by one who has no judgment, whose asserted debt is disputed and is the subject of pending litigation. With the best consideration we have been able to give this part of the case, we can not see our way clear to grant the injunction. If there is any warrant for enjoining a municipal corporation from making its annual budget and providing for municipal expenditures, because there is an omission of a creditor with a contract stipulating he shall be put on the budget, but the validity and performance of whose asserted obligation the City disputes and contests in court, the authority has eluded our research. If we, in view of the hardship of this case, pressed on us in argument, issue the injunction, we make the precedent repugnant, as we think, to settled principles and apt to prove extremely embarrassing in the future.

But the injunction in this case is the mere auxiliary of the *mandamus*, and the difficulty in respect to that remedy is, in our view of the most serious character. The *mandamus* issues only to enforce the purely ministerial duty imposed by law. It is said here, the duty arises from an ordinance of the council, and that the ordinance is a law. The ordinance authorized the contract. The ordinance followed by the agreement creates the commutative contract; the company is to remove the garbage in the mode and under the conditions stated in the contract; on performance of the work by the contractor

he is to be paid by the city. The duty of payment arises from the contract, or rather its performance. Our research confirms us in the opinion that no *mandamus* can issue to enforce an obligation, which, if it exists, simply arises from a contract and its faithful performance. We find the law epitomized thus: "Duties imposed on a corporation, not by express law or by the conditions of its charter, will not be enforced by *mandamus;* the use of the writ is limited to obligations imposed by law." High, Secs. 321, 339. We have been inclined to think it elementary that the duty to be enforced must be imposed by law, not contract. In the much discussed case of Kendall vs. United States, 12 Peters, 554, devoted, it is true, in large part to other questions, the right to the *mandamus* was placed on the ground of the duty sought to be enforced, was purely ministerial, imposed by law. Take the array of cases in Bouvier. They refer to writs of *mandamus* to enforce duties created by law. In our reports we have the *mandamus* to compel the levy of a tax directed by law; the bank required by its charter to exhibit the list of its shareholders may be compelled by *mandamus* to do so; the treasurer required by the Constitution and laws to pay the auditor's warrants on specific appropriations may be constrained by *mandamus*. Watts, Templeton *et al.* vs. Police Jury of Carroll, 11 An. 141; Hatch vs. Bank, 1 Rob. 470; Cockburn vs. Bank, 13 An. 289; Homerich vs. Hunter, 14 An. 225, and others, but none involving a mere contract obligation. In the cases cited by the Relator of writs of *mandamus* to compel the levy of a tax to pay municipal bonds, the basis for the writ has been the law under which the bond issues, directing the tax to be levied. Dillon on Municipal Bonds, Sec. 25; Von Hoffman vs. Quincy, 4 Wall. 555; Butz vs. Muscatine, 8 Wall. 577. It seems to us the conclusion must be the writ follows and enforces the ministerial duty created by the law, and will not command the supposed duty arising only from contract.

Again, the issue on the writ of *mandamus* confined to the enforcement of the obligation arising from the law does not admit of the inquiry into the asserted violation of a contract. In this case the proof tendered by the City to show the *non*-performance of the contract was included. If not performed there was no obligation of the city. We are asked, then, to enforce, though only to a limited extent, a contract the defences to which are alleged, and the enforcement is asked in proceeding by *mandamus* in which the defences can

not be urged. It seem to us the inability to urge any defences, though they may exist, is in itself suggestive that the *mandamus* is not the remedy for the asserted wrong of the relator. We find the principle running all through the text-books, in connection with another restriction on the writ, that " *mandamus* is not an appropriate remedy for the enforcement of contract rights, and it is not the province of the writ to settle differences of opinion between municipal authorities and claimants as to the amount due for ·services rendered; all disputed claims or accounts against the municipality should be referred to the jury and to the ordinary processes of the courts, and in the foot-note of the text-book is the suggestive reference to a Pennsylvania decision, that after judgment against the municipality on the disputed demand the writ may issue to enforce its payment. High Extraordinary Remedies, Secs. 339, 321, 25; 16 Sargeant & Rawle, p. 17. In the same line the author states that pending litigation in another court in which the relator has invoked relief will be a bar to the writ of *mandamus* sought by him. Sec. 25. If in answer to all this it is said the writ does not seek to compel payment to the garbage company, still it is none the less true that the relief asked is a step toward compelling that payment. If the remedy cannot be invoked for performance of the contract, every advance in that direction is forbidden under a writ of specific and restricted scope. If the writ issues the court intervenes in a controversy of the City with its creditor as to the validity of his contract with the City, and notwithstanding the denial of any liability on its part, and its pending litigation on the subject in the United States Circuit Court directs the city to place the disputed amount on its budget, in legal effect setting aside the fund for its payment. If, as we think it clear, that contract obligations and disputed claims can not be the basis of the writ of *mandamus*, then what we are asked to do, though short of ordering payment, is extending the writ of *mandamus* beyond the well-defined limits of the law. That we do to-day we may be called on to repeat to-morrow. The result would · be to transfer to this court every issue between the city and its creditor, claiming under a contract stipulating he should be put · on the budget, and irrespective of all defences of the city, we should · be called on to control its budget so as to make place on it for all claims disputed by the city and resisted in the courts. With · the most patient consideration we are unable to give our sanction to ·

such use of the writ of *mandamus*, confined by universal acceptance, we think, to purely ministerial duties and not to end or aid disputed contract obligations.

There is another aspect of this case. We find on this budget of 1897, items of expenditure of the year 1896. Under our revenue system the expenses of the year must be paid from the revenues of that year. It is a salutary provision to check municipal extravagance by forbidding the anticipation of the revenues of future years to pay the debts of the present. In this respect the budget proposes an unlawful diversion of funds, the prevention of which is the appropriate office of the writ of injunction. High on Injunction, Sec. 1269. Although the relator, in our view, is not in position to demand payment, his right of payment from the revenue of 1897 being contingent on the judgment he may obtain, we think, sufficient to entitle him to the injunction against the application of the revenue of 1897 to pay liabilities of 1896.

A large part of the discussion here has been directed to the assertion of power in the council to end a contract by resolution. This and other phases of the argument, we pass in a decision turning altogether on the remedy sought by the relator. We have not been inattentive, either, to the consideration pressed on us with great earnestness of the effect of leaving the relator off the budget of 1897, and thus it is claimed excluding him practically from all provision for payment of his demand under a contract of the city, on the faith of which it is stated the Garbage Company has expended a large amount for the plant and the equipment necessary for the performance of the contract. If it be determined in the appropriate proceeding the city has any defence against this contract, the relator will have to bear his loss. If, on the other hand, it is ascertained the City has no cause of complaint, the relator will be left only with his suit for damages admitting, if recovered, of no satisfaction from the revenues of this year, because the Council proposes to apply them to other purposes, and denied any recourse on the revenues of the future by the law devoting the annual revenue of each year to the year's expenses and excluding all other demands. While we appreciate this argument the question of the right to the remedy sought must be submitted to other tests. If the relator stood at the bar of this court with judgments fortifying his contract rights, his position would be sensibly altered. If after he presents himself

with such judgment establishing his right to the instalments to be paid to him each and every month according to his contract, this court would be called to exert its control as far as practicable over the budgeted revenues of the year, so as to secure his rights and the observance of the law requiring the application of the year's revenues to the debts of the year. Our judgment on the remedy alone will leave the relator the full benefit of other modes of relief.

It is therefore ordered, adjudged and decreed that the judgment of the lower court be avoided and reversed in so far as it directs the city to place the relator on the budget of 1897, as claimed by him, and enjoins the payment of the one hundred and twenty thousand dollars now on the budget, but in so far as said judgment decrees that the city be enjoined from applying the revenues of 1897 to the items on the budget for debts or expenses of 1896, that the judgment of the lower court be and is hereby affirmed.

NICHOLLS, C. J., concurs in the decree.

### CONCURRING OPINION.

BREAUX, J.   The respondent and the relator agree that the issue before us for determination was not whether the contract with the relator was one which the city had authority to make, nor whether the city could recall it by ordinance or should sue to have it decreed null.

All these questions are pending before another court.

It is unnecessary for the purpose of the decision of the questions before us to exp ess an opinion upon the merits of the controversy which is not before us.

The issues here are limited to the *mandamus* sued for and the injunction.

As to the first, the *mandamus*, the question was whether the relator was entitled to the writ of *mandamus* to compel the city to appropriate in its annual budget of expenses for the year 1897 the sum of one hundred and twenty thousand dollars, to be paid to the relator in monthly instalments of ten thousand dollars, in accordance with the terms of the contract.

As to the second, the injunction, the question is whether the relator is entitled to the writ of injunction prohibiting the city from disposing of the amount just stated, until the city shall first have provided for the payment of that amount.

Recurring to the writ of *mandamus*.

It does not issue *ex debito judiciæ*.

It may be withheld if there is other specific and adequate remedy.

The proposition is fully supported by authority, that the power to issue that writ or to withhold it, rests within the sound discretion of the court.

The contract upon which the application is founded is already the subject of another suit. The right of the relator to recover anything under the contract is questioned.

It is well settled that *mandamus* lies to compel the payment of a judgment, but here, before any judgment has been rendered upon the claim in another court, it is sought to compel the city to place upon its budget an amount to meet the claim. In other words, it is sought to have an amount budgeted and held to be applied to the payment of relator's claim in case a judgment be obtained before another court.

The city, we are informed, before another court pleads that the contract is *ultra vires*, and sets forth, in its defence, a number of other grounds of nullity.

Prior to a determination of these issues the court is called upon to make a decree as if there was no controversy as to the right claimed under the contract.

May it not be said in response to this demand that repeatedly it has been held that courts will refuse a *mandamus* if the right of the one applying therefor is not clear.

The vigorous defence, we infer, made in another tribunal, divests the right of the conclusiveness it possibly would have if the many grounds of nullity were not urged.

It has also been decided in a number of cases that *mandamus* will not be allowed in cases involving numerous questions of law and fact.

To sustain a *mandamus* the applicant must have a clear legal right.

The People vs. Croton Aqueduct Board, 26 Barbour's Supreme Court Reports, citing 13 Barb. 443, and 10 Wend. 365.

Applying this principle, the Supreme Court of Illinois, in People vs. Chicago, 53 Ill. 427, held: the relators having resorted to another court to adjust and enforce the rights of all concerned, it would not exercise jurisdiction in the mode desired by issuing the writ of *mandamus*.

Another question arises, not controlling it may be, yet worthy of some consideration.

The purpose of the writ is to compel the respondent to make an appropriation in accordance with the contract. The effect may be to compel the city to return to a contract and have it enforced, notwithstanding the grounds alleged.

In that case, is it not within the authority of the court to withhold or grant the writ of *mandamus* according to the justice of the case as made to appear by the facts exhibited?

Weighing the extent of the injury which the relator will suffer if the order be withheld, and the consequence to the opposite party if the order be granted, in my view, within its discretionary power the court can grant or withhold the relief sought according to the exigencies in the case, particularly for the reason that the writ of injunction applied for will serve as far as possible, under the circumstances, to safeguard whatever right the relator may have.

A court may grant the writ of injunction to preserve a right in *statu quo* for a limited time in order that it may be litigated, and this may be granted without expressing an opinion or without having the means of expressing an opinion as to the legality of the claim.

In my judgment the city should not be enjoined from paying needful amount to perform its Augean task, a task of the greatest importance in this climate and at this season. Nor should *mandamus* issue to compel the city to withhold the whole amount budgeted to meet the expenses of removing the garbage, for a company, be the cause what it may, not at present employed in removing the garbage.

I concur in the decree.

### DISSENTING OPINION.

WATKINS, J. This is a proceeding by *mandamus* on the part of the relator to compel the City Council, representing the respondent, to appropriate in her annual budget of expenses for the year 1897 the sum of one hundred and twenty thousand dollars, to be paid relator in monthly instalments of ten thousand dollars, in accordance with the terms of its contract, for the year 1897, made under and in pursuance of Ordinance No. 7860, C. S., bearing date August 3, 1893, same being for the collection, removal and disposal of garbage from the streets and public places of the city of New Orleans.

This suit was filed in the District Court on the 11th of December, 1896, and served on the Mayor on the same date, commanding him to show cause why the city should not comply with the relator's demand, and the alternate writ was made returnable on the 21st of December, 1896.

On the trial in the lower court there was judgment in favor of relator, and the city as respondent prosecutes this appeal.

The averments of the relator's petition are that on the 12th of September, 1893, the city of New Orleans entered into a contract with Edward G. Schlieder for the removal and disposal of garbage, by virtue of and in accordance with city Ordinances Nos. 7860 and 7992, C. S., and Resolution No. 8660, C. S., and that on the 29th of March, 1894, he transferred and assigned the same to the relator.

That thereupon the fertilizing company prepared itself and provided the means for entering upon the performance of its engagement, and to that end purchased property and thereon erected all the necessary buildings and provided itself with all the needed machinery, apparatus and appliances necessary, together with the necessary wagons, carts, mules, horses, etc., at an aggregate expense to itself of about three hundred thousand dollars.

That, after due proclamation by the mayor, and in keeping with the terms and stipulations of its contract with the city, it entered upon the discharge of the obligations thereof about the 1st of August, 1894, and has continued to discharge and perform same to the date of filing this suit; and that the city regularly paid the monthly allowances due to the company up to and including the month of May, 1896, but has since that time neglected and refused to pay that sum or any other sum on that account.

The further averment is, that under the contract it was provided that for five years after its date the sum of six hundred thousand dollars should be paid in sixty equal instalments of ten thousand dollars each, and that all of said payments were to be made out of appropriations to be made in the annual budget of expenses of the city.

That Sec. 93 of Act 45 of 1896—the charter of the city—provides that the City Council shall, once in twelve months, before fixing and deciding upon the amount of taxes and licenses to be assessed for the ensuing year, cause to be made out a detailed estimate exhibiting the various items of liabilities and expenditures, including the

requisite amount for all expenses of the city during the said year; and shall cause the same to be published for at least ten days in the official journal of the city; and such rate of taxation, as provided by law, on every hundred dollars of valuation, shall thereafter be fixed and assessed, as together with other revenues of the city may be necessary to meet the estimated liabilities and expenditures.

That the adoption of this detailed estimate shall be considered as the appropriation of the amount therein stated, and that the comptroller shall not audit, nor shall the treasurer draw or sign any checks upon the fiscal agent for any claims unless an appropriation therefor has been made in accordance with that act.

That the City Council has caused the detailed estimate above referred to, to be published as the law requires, but that no provision is therein made for the relator under its contract, for 1897, notwithstanding it was the duty of the city to provide therefor, in the said budget for 1897, the sum of one hundred and twenty thousand dollars—same being the amount due the relator under its contract for the year 1897, and that it is without remedy in the premises, save by the writ of *mandamus*.

The further averment is then made that, in order to excuse and justify its conduct in the premises, the City Council at one time pretended that relator's contract was null and void *ab initio*, and at another time that it had, subsequently to its execution, terminated and ceased to have any binding force because of the company having failed and refused to gather and remove garbage in accordance with the stipulations thereof; while, on the other hand, that of the relator was, and it charges the truth to be, that the contract was made and entered into in pursuance of and after due compliance with all the forms of law, and is valid and binding in all respects, and that all obligations and duties thereby imposed have been regularly and fully performed in all respects.

The relator further alleges that the city has no other means of paying her debts and contract liabilities than a limited power of taxation granted to her by her charter, and that if the proceeds thereof, together with other municipal revenues, be entirely disposed of and appropriated by the City Council without setting aside the amount it requires to satisfy its demands for the current year, there will be no funds available for that purpose, and that a judgment against the the city would be unavailable and uncollectible and of no value

whatever.  And, in conclusion, the relator avers that "practically the city of New Orleans, in view of its limited power of taxation, its limited revenue and its intention, as shown in said published estimate of expenditures, to dispose of the whole of the revenue of 1897 without providing for the claim of relator, should be "practically regarded as an insolvent debtor, and that the writ of *mandamus* prayed for should therefore issue, and after due proceedings, be made peremptory, *without prejudice to the rights of the city, if any she have, by appropriate judicial proceedings, to urge the invalidity of or to secure the annulment of the said contract.*"

The respondent returns, substantially, that the City Council *attempted*, by Ordinance No. 7860, C. S. (the one referred to by the relator), to make a contract with the relator for the removal and disposal of garbage within the garbage district designated in the same, which was divided into seventeen districts, the contract being for the period of twenty years, and bearing date 29th of August, 1893.

It then reiterated, substantially, the statement made by the relator, and then represents, that about the 1st of June, 1896, complications arose between the company and the city in regard to the manner in which the former was gathering and removing garbage, when, at the instance of the Board of Health, prosecutions were commenced against the company's employees for the purpose of preventing the practice indulged in by the relator " of dumping garbage upon lots and squares in the city."

It then states that the health authorities subsequently called upon the city and demanded that steps be taken by the city for the removal of all offensive matter from the markets, streets and public places of the city; and that thereupon the City Council—having made a special investigation of its own, as to the manner in which the relator was collecting and removing garbage and operating its plant—adopted Ordinance No. 12,537, C. S., on the 30th of July, 1896, " declaring the plant of the Southern Chemical and Fertilizing Company, Limited, and the business of collecting, removing and disposing of garbage, as conducted by said company, a public nuisance, and directing the Commissioner of Public Works to immediately take charge of the collection, removal and disposal of garbage."

It further returns that, since the adoption of that ordinance " the department of public works has discharged the duty of collecting,

52

removing and disposing of the garbage at an average monthly cost of seven thousand four hundred and twenty-two dollars and twenty-three and a half cents.''

Reference is then made to the present suit, in which details are given similar to those we have outlined from the relator's petition, and then follows the purport of its exception to the effect, that the petition discloses no cause of action, and of the answer to the effect, that the contract was absolutely null and void, and that, if valid, it had been violated. Brief, p. 10.

Then comes the following pertinent allegation, viz. :

'' That the writ of *mandamus* could not issue to compel the performance by the city of a contractual duty, especially when the existence of the contract was denied, and where the party applying for the *mandamus* has adequate remedy at law; and that as the city of New Orleans, under the power delegated to it by law, had declared the plant of the Southern Chemical and Fertilizing Company, Limited, and the business of collecting, removing and disposing of garbage as carried on by said company to be a public nuisance, and had ordered its own officers to discharge the duty of collecting, removing and disposing of the garbage, the finding of the City Council was conclusive until set aside by a court of competent jurisdiction in a proper proceeding and on proof that Ordinance No. 12,537 was an unwarranted and unreasonable exercise of municipal authority.''

It then declares, that '' *subsequent to the filing of the petition for mandamus*, to-wit, on the 16th of December, 1896, the budget of revenues and expenses of the city of New Orleans for the year 1897 *was finally approved*.'' *Vide* Ordinances Nos. 12,936 and 12,937.

This is the case as presented upon the petition and return in the *mandamus* proceedings.

The contract, in form and effect, as set out in the petition is admitted in the return, coupled with the averment (1) that it was *ultra vires* and void *ab initio*, and (2) that if not void, it was terminated by the company's failure to gather, remove and dispose of garbage in keeping with its provisions; and (3) that the city, at the instance of the health authorities, having found and declared that the manner in which the company was neglecting and failing to remove garbage constituted a public nuisance, had undertaken to abate the same through the instrumentality of the department of public works.

Not denying, but on the contrary affirming the facts to be as stated

in the relator's petition in respect to the budget of 1897, the respondent plainly states, that the city has disavowed and repudiated its contract through the instrumentality of its own *ex parte* action in passing and promulgating an ordinance declaring the company to have been derelict in its duty, and the operation of its plant a public nuisance; and then retorts by saying the writ of *mandamus* can not issue against *the city* to compel its performance of a contractual duty, especially, as in this case, when *its existence* is denied.

From the foregoing statement it is evident that the two questions presented for consideration are (1) whether the city can, in the manner proposed, *dispossess* the fertilizing company of the franchise. of which it became the owner under the contract of September 12, 1893, and (2) this attempt having been made by the city authorities, can she be kept to her engagements under her contract, and coerced by *mandamus* to make provision in the annual budget of expenses and appropriations for the current year 1897 for the sufficient amount of money to meet the monthly instalments of ten thousand dollars that are due and those which are to become due thereunder during the year 1897?

The proposition of the City Attorney seems to be .that the City Council considered the fertilizing company in the light of an unfaithful servant, and exercised the right of turning it away, and that any right the company has for its restoration to the service and employment of the city, being purely contractual, specific performance thereof can not be enforced by *mandamus*.

On the contrary, the contention of the relator is that the city advertised and sold as a public franchise the exclusive right to gather, remove and dispose of garbage within certain designated municipal districts of the city and in a manner particularly described, and that same was adjudicated at public auction at a competitive bidding to one E. G. Schlieder for the period of twenty years, in exact compliance with an ordinance of the city, which particularly and exclusively dealt with that subject, and as the city was authorized to do under the statutes of the State on the sub,ect of garbage and the provisions of. the city charter then existing.

That in pursuance of the said ordinance and the law, the city entered into a contract with said Schlieder, adjudicatee, for the removal and disposal of garbage, by the terms of which she promised and agreed to pay the sum of one hundred and twenty thousand

dollars, annually, for the first five years from and after the 29th of August, 1893; for the second period of five years one hundred and thirty-four thousand dollars per annum; for the third period of five years one hundred and fifty thousand dollars per annum; and for the fourth period of five years one hundred and sixty-five thousand dollars per annum, said sums to be paid in equal monthly instalments.

That Schlieder subsequently assigned all his rights under the ordinance, adjudication and contract, to the Southern Chemical and Fertilizing Company, Limited, a corporation organized under the laws of the State for the express purpose of collecting the garbage of the city and manufacturing same into fertilizers; that it established a plant for that purpose and procured all the necessary paraphernalia for the purpose at an outlay of three hundred thousand dollars, and began and continued operations thereunder without serious objection or hinderance of any kind until about the 1st of June, 1896.

Predicated, substantially, on this statement, the contention of relator's counsel is, that it is not in any sense a servant or laborer for hire of the city whom she may turn away at pleasure, but an independent proprietor and adjudicatee of a public franchise who has contracted with the city to perform for the city a service in the removal of garbage, for a stipulated consideration in money, and for the payment of which the city in her ordinance and contract specially provided, that provision should be annually made in her budget of expenses and appropriations.

That the necessary and legal consequence is, that the only questions which may have arisen or can arise between the company and the city are (1) the right of the city to repudiate her agreement to provide for and make payments of the instalments of the price as they fall due, and (2) the right of the relator to compel the city to keep to the covenants of her ordinance and contract and annually provide therefor in her budget if she refuse.

But before proceeding to discuss and dispose of these propositions, it is necessary that a statement should be made of the injunction which the relator applied for and obtained *pendente lite* as an ancillary proceeding which it deemed necessary for the purpose of preserving the *status quo* of the fund, and prevent its disposition or disbursement until a final judgment should be rendered on the principal demand.

Receiver vs. City.

The petition for injunction, substantially, states that after the cause was set down for argument in the lower court, but before it was argued, the relator filed same, in which he reiterated in substance the averments of the petition for *mandamus*—setting forth the then attitude and situation of the case—and stated that notwithstanding the pendency thereof the respondent had, *since the service of the alternative writ*, passed ordinances, commonly known as 12,936 and 12,937, C. S., being her budget of intended and estimated expenditures for the year 1897, distributing all the revenues of said year without making any specific appropriation therein for petitioner's debt, but inserted therein an appropriation of one hundred and twenty thousand dollars for "removing garbage (in) 1897," and also an appropropriation for "removal of garbage in 1896" of forty thousand dollars.

The further averment is made, that until recently previous to that date it had hoped and believed that the appropriation of one hundred and twenty thousand dollars for removing garbage of 1897 was intended as an appropriation in its favor to be held in abeyance until the decision of this cause—it being for exactly the same amount as is therein demanded—but that *said two ordinances destined it to the use and for the payment of the Commissioner of Public Works*, and to other persons than the relator, for expenses incurred in the removal of garbage during 1897, and that if said ordinances be carried into effect, and the money thereby appropriated be paid accordingly, *all funds applicable to the payment of relator's contract and presented for adjudication in the mandamus proceeding will be diverted and squandered, and relator irreparably injured, unless stayed and restrained by the writ of injunction.*

The further averment is made that it is expressly provided by Act 30 of 1877 (Sec. 3) that the revenues of the several parishes and municipal corporations in this State, of each year, shall be devoted to the expenditures of that year, provided that any *surplus* of said revenues may be applied to the indebtedness of former years, and that therefore the appropriation of *forty thousand dollars for the removal of garbage in 1896* is illegal and absolutely null, void and of no effect until and unless any and all demands against the revenues of 1897 shall have been paid, and that relator has the legal right *and insists that its legal demands shall be met and paid before any sums whatever are appropriated for the payment of any obligation of any year prior to 1897* out of the budget for that year, and to that end

and effect the relator demanded an injunction for the purpose of *preventing said ordinances being carried into effect, and the said sums of one hundred and twenty thousand dollars and forty thousand dollars being disbursed and diverted during the pendency of the mandamus proceedings.*

The respondent sought to have the injunction dissolved on giving bond, but failing in that she filed an answer denying that relator has any interest in the appropriation of either the one hundred and twenty thousand dollars or the forty thousand dollars in the budget of expenses for the year 1897. The suit was argued and submitted on the merits of the *mandamus* and injunction, and judgment was rendered in favor of the relator, making the *mandamus* peremptory and the injunction perpetual, hence both are embraced in the respondent's appeal.

The facts that need be stated are few and simple. That the city Ordinance No. 7860, relative to the removal of garbage, was regularly passed and promulgated, there is no question, and there is none that it was a duty imposed upon the city by the terms of her charter as well as by the general law relative to the exercise of the police power to provide for the removal of garbage for the better sanitation and preservation of the health of the city. There is none as to the fact that said garbage ordinance was authorized by the special provisions of the law with reference to the removal of garbage as well as by the provisions of the legislative charter of the city, and there is none as to the fact that the proposed contract and franchise therein outlined was regularly advertised, sold and adjudicated to Schlieder and assigned to the relator after the city had bound herself to the performance of her part of its stipulations in a solemn notarial act and had executed and delivered her obligations conformably thereto.

The following is the ordinance, reproduced in its entirety, for the purpose of accuracy and to avoid any question of doubt or misconstruction, viz.:

" MAYORALTY OF NEW ORLEANS, }
" City Hall, August 3, 1893. }

" No. 7860, Council Series.

" An Ordinance to Provide for the Collection and Disposal of Garbage, etc., by the Adoption of a System therefor, and the Entering into a Contract therefor for Twenty Years, and Providing Penalties for the Violation of this Ordinance.

" WHEREAS, the method of removing and disposing of garbage

heretofore used in this city has proved entirely inefficient, insufficient and objectionable to the public as well as to private citizens; and

" WHEREAS, the fast-increasing growth of the city and increase of population demand the adoption of some modern and efficient method of garbage removal, such as is in use in other cities of the United States; and

" WHEREAS, the Board of Health has recommended that the city of New Orleans take steps to provide some such system:

"SECTION 1. *Be it ordained by the Common Council of the city of New Orleans,* That the Comptroller be and he is hereby directed to advertise for ten days, according to law, for sealed proposals for the collecting, removing and disposing of all garbage from private residences, business places, streets and alleys, and all public places within the limits of the city of New Orleans, as described in the garbage districts hereinafter enumerated, for twenty years, by some improved system similar to those in use in other cities of the United States.

" Every bidder making proposals under this ordinance shall state the price per annum, divided into four periods of five years each, at which he is willing to contract therefor under the terms of this ordinance.

"All bids received by the Comptroller shall be reported to the City Council.

" The City Council shall award the contract to the bidder whose price is most satisfactory to them, but this award shall not be final until the successful bidder has presented a system of disposing of refuse vegetable and animal matter, including dead animals, in a manner which is scientific and sanitary, disposing of whatever is injurious to health and discomforting to the human race, at the same time preserving whatever is valuable in the material aforesaid. The City Council reserving the right to reject any and all bids.

" SEC. 2. *Be it further ordained, etc.,* That each bidder, prior to submitting his bid, shall deposit with the Treasurer the sum of twenty-five thousand ($25,000) dollars in United States currency, shall file a receipt therefor with the Comptroller, as evidence of his qualification to bid. This deposit is required as an earnest of good faith upon the part of all the bidders, and all deposits shall be returned to all unsuccessful bidders immediately after the final award by the Council, and the deposit of the successful bidder shall be retained by the Comptroller until the notarial contract herein provided for is signed, and said deposit shall be forfeited to the city of New Orleans, in case said adjudicatee shall fail to enter into said contract and furnish the necessary bond. When said contract is signed and bond given the deposit shall be returned to the adjudicatee.

" SEC. 3. *Be it further ordained, etc.,* That the city of New Orleans, for the purposes of collecting and disposing of all garbage, shall be divided into seventeen districts, to be known as garbage districts, which districts will be as follows, to-wit:

" First. Thalia to Felicity Road, river to Claiborne.

" Second. Thalia to Julia, river to Claiborne.

" Third. Julia to Canal, river to White.

" Fourth. Canal to St. Louis, river to White.

" Fifth. St. Louis to St. Philip, river to Broad.

" Sixth. St. Philip to Esplanade, river to Hagan avenue.

"Seventh. Esplanade to Elysian Fields, river to Broad.

" Eighth. Elysian Fields to Enghein, river to Claiborne.

" Ninth. Enghein to Louisa, river to Claiborne, Louisa to Poland, river to St. Claude.

"Tenth. Felicity Road to First, river to Claiborne.

" Eleventh. First to Toledano, river to Claiborne.

" Twelfth. Toledano to Napoleon avenue, river to Dryades.

" Thirteenth. Napoleon avenue to Peters avenue, river to Dryades.

" Fourteenth. Peters avenue to Lower Line street, river to Carondelet.

" Fifteenth. Jackson to river, Atlantic avenue to Powder.

" Sixteenth. Lower Line street to Carrollton avenue, river to Seventh.

" Seventeenth. Carrollton avenue to Upper Line street, river to Seventh.

" The above territory shall comprise the limits of the garbage districts of the city of New Orleans, and the provisions of this ordinance shall apply to same, except as to dead animals, which shall be removed by the contractor from places wherever dairies or stables are located outside of said limits.

" Sec. 4. *Be it further ordained, etc.*, That the word ' garbage,' as used in this ordinance, shall be construed to mean house and kitchen offal, and all refuse matter not excremental, whether solid or liquid, and composed of animal and vegetable substances, including dead animals, same coming from public or private premises of the city, and not destined for consumption as food. No ashes, dirt, or other substance foreign to garbage shall be covered by this contract, except as hereinafter provided, and it shall be unlawful for any occupant or occupants of any premises in the city of New Orleans to mix any such ashes, dirt, or other substance foreign to garbage with the garbage to be removed from said premises as herein provided, under a penalty of not less than five nor more than twenty-five dollars fine for each offence, or imprisonment for not more than thirty days.

" Sec. 5. *Be it further ordained, etc.*, That the contractor shall, by proper notice in writing, issued to occupants of premises in the several garbage districts, inform the occupant or occupants of such premises of the hours when garbage will be removed from said premises, and it will be the duty of such occupants of such premises to have all garbage ready for removal therefrom at the hours so designated by the contractor for such premises, under a penalty of not less than ten dollars fine or imprisonment for not more than ten days for each offence.

" Sec. 6. *Be it further ordained, etc.*, That it shall be the duty of the contractor to collect and remove from all private residences, business places, streets and alleys, and all public places within the limits of the garbage district aforesaid, all slops, offal, garbage, dead animals, in suitable vehicles or carts, and other animal and vegetable matter in inclosed water-tight metallic vehicles or carts, so that no drippings or refuse can be dropped on the streets, alleys or public places in the city, to a certain point or points, to be approved by the City Council, where the said contractor shall have erected, on land

owned or leased by him, a first-class plant, including the necessary buildings and machinery for the destruction by fire *or the reduction and conversion of said material so removed into merchantable products.* Said plant shall have a capacity sufficient and ample to promptly and daily dispose of all material so to be removed and collected by said contractor in the garbage districts of the city of New Orleans as aforesaid. The vehicles or carts above referred to shall each be provided with a gong of sufficient size to be plainly heard by the occupant or occupants of the premises, and said gong shall be rung on the approach of such vehicle or cart, as notice to the occupants of the approach thereof.

" SEC. 7. *Be it further ordained, etc.,* That it shall also be the duty of the contractor to remove from within the said garbage districts all street pilings, collected by the public works department from gutters; ashes, house and ordinary street sweepings, but he shall not be required to remove *debris* from buildings in course of demolition, repair or construction, or any other refuse except that enumerated in this ordinance.

" SEC. 8. *Be it further ordained, etc.,* That the contractor shall, by proper notice in writing, issued to the occupants of premises in the several garbage districts named, inform the occupant or occupants of such premises of the hours when said ashes and house sweepings will be collected and removed, and it shall be the duty of such occupant or occupants to have such house sweepings and ashes placed in a box or barrel at some convenient point for the contractor and ready for removal at the hour designated by him, under a penalty for each omission of not more than ten dollars' fine or imprisonment for not more than ten days.

" SEC. 9. *Be it further ordained, etc.,* That the Commissioner of Public Works shall notify the contractor, in writing, of all street sweepings and pilings which are ready for removal, and it shall be the duty of the contractor, within twelve hours after such notice (unless prevented by bad weather) to remove all such sweepings and pilings so designated, under forfeit of ten dollars for every twelve hours he fails to remove said designated pilings, said forfeit to be deducted monthly from the amount due the contractor, in the manner herein provided for similar deductions as to garbage in Sec. 13 of this ordinance.

" SEC. 10. *Be it further ordained, etc.,* That the said works and plant shall, at all times, be subject to the inspection and supervision of the Board of Health of the State of Louisiana, and said board shall have supervision of the means and men employed in the collection, removal and disposition of said garbage, and if at any time the said collection and removal shall be improperly done or not conducted in a sanitary manner, through fault of said employees, said employees shall, on demand of said Board of Health, be discharged by said contractor and reliable and competent men put in their places,

"SEC. 11. *Be it further ordained, etc.,* That the said contractor shall collect all dead animals daily and all slops, garbage, offal and animal and vegetable matter in the city of New Orleans daily, from all private premises, public grounds, market places, restaurants, hospitals, slaughterhouses and all other places where animals, fowls or game are killed within the aforementioned garbage district.

" Sec. 12. *Be it further ordained, etc.*, That the said contractor shall hold the city of New Orleans harmless and free from all loss, cost or damage that the said city may incur on account of the collection of said slops, offal, garbage, dead animals and animal and vegetable matter, and the transportation and disposal of the same as above set forth.

" Sec. 13. *Be it further ordained, etc.*, Should any complaint of non-collection or removal of garbage be made to the Commissioner of Public Works, which, upon investigation, shows that garbage, etc., has not been removed within the proper time, the said contractor shall upon notice by said Commissioner of Public Works, immediately send a special wagon to remove and collect the same, and on contractor's failure to collect and remove the said garbage within twelve hours after said notice, the said contractor shall forfeit the sum of ten dollars for each and every twelve .hours that he fails to remove said garbage, and such penalties shall be held and deducted monthly from the amount earned under this contract by certificates issued to the Comptroller by said Commissioner of Public Works. In case said contractor is aggrieved by said deductions of said Commissioner of Public Works, he may appeal to the Council for relief, but the decision by the Council in said matter shall be conclusive and binding upon the contractor.

" Sec. 14. *Be it further ordained, etc.*, That when the contractor is ready to begin operations under this ordinance he shall notify the Mayor thereof, and the Mayor shall thereupon issue his proclamation to that effect, notifying the people of the city of New Orleans to comply with the terms of this ordinance, and it shall thereupon become the immediate duty of the occupant or occupants of every dwelling house or other building in the city of New Orleans to provide a suitable metallic, water-tight covered box or other covered metallic vessel, in which said occupant or occupants shall cause to be placed daily all offal, garbage, slops and refuse animal and vegetable matter from the premises, and shall place such metallic, water-tight covered box or other metallic covered vessel in such place as will be most convenient for said contractor to remove same, and any failure to comply with the provisions of said proclamation shall subject said occupant or occupants to fine of not more than ten dollars or imprisonment for not less than ten days for each and every day they shall fail to provide such box or vessel or comply with the provision of this section.

Sec. 15. *Be it further ordained, etc.*, That after the proclamation of the Mayor, as aforesaid, it shall be unlawful for any other person than the said contractor to collect, remove or dispose of from any public or private place any garbage, dead animals or other matter provided for in this ordinance and any person violating this clause of this ordinance shall be fined not less than five nor more than twenty-five dollars for each offence, or shall be imprisoned for not more than thirty days.

" Sec. 16. *Be it further ordained, etc.*, That within ten days from the adjudication of said contract by the City Council, the contractor must be ready to sign and enter into notarial contract before the city notary and provide and give to the city of New Orleans a bond in the penal sum of fifty thousand ($50,000) dollars good and solvent

security, to be approved by the Mayor, contingent for the faithful performance of each and every new covenant and condition of said agreement, and any failure on the part of the contractor to sign said contract and give said bond will forfeit to the city the twenty-five thousand ($25,000) dollars deposited with the City Treasurer at the time of his bid.

" SEC. 17. *Be it further ordained, etc.*, That the contractor shall be ready in all respects to enter upon the discharge of his dutiel under this contract within one year from the date of the signing of said notarial act, and any failure on his part to be ready, at the expiration of said year, shall subject him to a fine of one hundred dollars per day for each and every day after the expiration of said year that he fails to begin work under this contract.

" SEC. 18. *Be it further ordained, etc.*, That the price which the city of New Orleans is to pay the said contractor for the services to be performed under said contract shall be divided into sixty equal parts for the first five years, and the same ratio shall be the basis for all payments to said contractor for each succeeding five years during the existence of this contract, so that payments shall be made monthly on the one-twelfth principle. Payments shall be made to the said contractor by warrant of the Comptroller on the Treasurer of the city of New Orleans, and the city of New Orleans hereby binds and obligates itself to appropriate every year during the existence of this contract, in the annual budget of receipts and expenditures, the sum agreed to be paid said contractor each year.

" SEC. 19. *Be it further ordained, etc.*, That all ordinances and parts of ordinances in conflict with this ordinance be and the same are hereby repealed.

"Adopted by the council of the city of New Orleans August 1, 1892.

" DAN. A. ROSE, *Clerk of Council.*

"Approved August 3, 1893:

" JOHN FITZPATRICK, *Mayor.*

"A true copy: CLARK STEEN, *Secretary to the Mayor.*"

The following is an extract from the brief of the City Attorney, disclosing the amounts the city contracted for and agreed to pay to the relator for the removal of garbage, in the contract which was drawn up and signed on the 12th of September, 1893, namely:

" Under Ordinance No. 7860, C. S., advertisement for sealed proposals was made, and by Ordinance No. 7992, C. S., the bid of E. G. Schlieder was, on the 29th of August, 1893, accepted by the council, and the Mayor directed and authorized to enter into notarial contract with Schlieder, by the terms of which the Mayor was to bind the city of New Orleans to pay to Schlieder for the collection, removal and disposal of garbage, the following amounts:

"For the first five years, one hundred and twenty thousand dollars per year.

" For the second five years, one hundred and thirty-four thousand dollars per year.

" For the third five years, one hundred and fifty thousand dollars per year.

" For the fourth five years, one hundred and sixty-five thousand dollars per year " (brief, p. 4).

As this contract and ordinance have been several times under judicial investigation by this court, it will not be inappropriate to make mention of some of these adjudications in connection therewith and produce some of the court's expressions in reference thereto, especially in view of the charge of the city that the ordinance and contract thereunder are and were *ultra vires* and void *ab initio*.

For instance, in State vs. Payssan, 46 An. 1029, the court speaking through MR. JUSTICE BREAUX, said:

" With reference to the unreasonableness " (of the city ordinance relative to the removal of garbage) " and the apprehension charged, we deem it in place, preliminarily, to state that the Legislature delegated the authority to the municipality to adopt needful regulations for the protection of health, and to maintain cleanliness.

"It is true the word 'garbage' is not used in the charter, but the equivalent is therein expressed. The council is authorized to adopt ordinances for the freqent inspection of buildings and premises, and to compel cleanliness. This necessarily includes the authority to have moved away and destroyed garbage that is annoying to health. The general power regarding health and cleanliness having been given, we are of opinion that the ordinance can not be impeached as invalid on the ground of unreasonableness."

Again:

" On this appeal we can only decide that garbage which may cause discomfort, which is injurious to health, can be removed and destroyed under an ordinance adopted under a legislative grant of power, and that this ordinance may be adopted without creating a monopoly or divesting vested rights."

Again:

" We do not perceive that there is reason to complain of an ordinance authorizing the removal of garbage by contract. The city government has the power of deciding in what manner a nuisance shall be removed. In having the work done by a contractor employed in the manner required by law, they have not exceeded the discretion with which they are vested in such matters."

That was a prosecution which was inaugurated and carried on by the city in the affirmance of the ordinance and contract under consideration herein; and wherein the defendant resisted conviction and punishment on the grounds of the unreasonableness and illegality thereof. And in the opinion of this court, same were open to the objection neither of unreasonableness nor illegality.

In State vs. Morris, 47 An. 1660, this court, speaking through MR. JUSTICE BREAUX, recognized and announced similar principles as sustaining this ordinance and contract.

In Southern Chemical and Fertilizing Company vs. Board of Assessors, 48 An. 1475, this court, speaking through MR. JUSTICE MILLER said:

" The plaintiff is a corporation organized to execute a contract with the city of New Orleans to remove and dispose of the garbage and pilings of the city, and to manufacture chemicals, oils, soaps, candles, and similar articles, and for these purposes to erect and maintain mills and the necessary plant.

" It is in proof that plaintiff has purchased property, erected buildings and provided the machinery for the manufacturing purposes stated.     *   *   *

" The act of incorporation declares the objects of the company to be, the execution of the contract with the city, for collecting and disposing of garbage, street pilings and refuse; and to manufacture chemicals, soaps, candles and similar articles, and for such purposes to erect and maintain mills and a plant and manufacturing establishments.

" The ordinance of the council, under which the contract was awarded to plaintiff, is to remove and dispose of garbage. This function in aid of the cleanliness of the city is distinct from the manufacturing business announced in plaintiff's charter."

This decision distinctly recognizes the legality of the relator's charter, its existence as a going concern in the full exercise of its franchise and the large investment it has made in pursuance of the ordinance of, and its contract with the city; and that the company is a manufacturer of fertilizers from garbage in the sense of the constitutional article entitling it to have its large and valuable plant exempted from *ad valorem* taxation.

In Fertilizing Company, Limited, vs. Wolf & Sons, 48 An. 641, this court, speaking through CHIEF JUSTICE NICHOLLS said:

" Plaintiffs' occupation and business rest, as we have said, upon a

conventual contract which fixes its continuance for twenty years. They have vested rights in the matter of which they can not be divested by either the whim, the caprice or the dissatisfaction of the council. A rescission of their contract could only be brought about through proceedings in which would be subjected to judicia scrutiny and determination by judicial tests, the respective rights and obligations of the parties.''

That decision fixes, and forever establishes the legal *status* of the fertilizing company under the city ordinance and its contract with the city; and further that it, thereunder, possesses vested rights which can not be divested or taken away from it, by either the whim, the caprice, or dissatisfaction of the council.

In other words, that its legal. *status* can not be changed or disturbed otherwise than by legal proceedings, scrutiny and judgment.

A fair interpretation of these different expressions of this court in reference to this particular contract and ordinance forever silences the voice of the city as to the claim that her ordinance and contract were *ultra vires* and void; and with respect to her right to terminate her contract relations with the company, by the passage and promulgation of an *ex parte* ordinance declaring its plant and method of removing garbage a nuisance.

Nor can such an ordinance, passed with full knowledge of these decisions, give color or right to the city's attempt to displace and arbitrarily dispossess the relator, and undertake the collection and removal of garbage through the instrumentality of its own department of public works. Assuredly, Market Company vs. City, 47 An. 203, is not authority for that proposition.

Just here it is well to attract attention to the fact that the garbage ordinance and contract only embraced the populous and thickly inhabited portions of the city, and does not include the remote and outlying districts thereof, which continued to remain under the police superintendence and control of the City Council; and that within the district embraced by the ordinance and contract the proof discloses, and the fact is, that the relator is now, and at all times has been—with occasional exceptions, of course—engaged in collecting, removing and disposing of garbage according to contract; and proposes to continue to do, notwithstanding the city is likewise so engaged.

Nevertheless the City Council caused to be prepared and advertised an annual budget of expenses for the year 1897, at an early

Receiver vs. City.

date in December, 1896, as it was in duty bound to do under the city charter, and the following extracts are made therefrom, viz.:

BUDGET OF EXPENDITURES FOR 1897.

Contracts—

| | | |
|---|---|---|
| Jefferson City Gas Light Company | | $30,105 00 |
| Louisiana Electric Light Company | | 180,000 00 |
| New Orleans Waterworks and Electric Company, Ordinance No. 909, C. S., act Jos. D. Taylor, October 3, 1894, 1680 hydrants at $60 each, $100,800, less 6 per cent. deduction for cash payments to be deducted from last payment, eleven months, at $9400 | $92,400 00 | |
| One month at $2352 | 2,352 00 | 94,752 00 |
| Algiers Waterworks Company, Ordinance No. 11,262, C. S., act Jos. D. Taylor, November 20, 1895, 200 hydrants at $60, $12,000, subject to same deductions as above. Eleven months at $1000 | 11,000 00 | |
| One month at $280 | 280 00 | 11,280 00 |
| Ordinance No. 12,693, C. S., Geo. D. Barnard & Co.— | | |
| 400 polling booths at $6.75 | 2,700 00 | |
| 1200 annex booths at $5.75 | 6,900 00 | 9,600 00 |
| Ordinance No. 12,712, C. S., E. F. Keplinger & Co.— | | |
| 475 ballot boxes at $1.35 | | 641 25 |
| Rents City Recorders' Courts | | 1,000 00 |
| Rents engine houses and police stations | | 1,800 00 |
| Public sinks | | 1,500 00 |
| Meals to jurors | | 2,500 00 |
| Insurance on city property | | 4,000 00 |
| Great Southern Telephone and Telegraph Company | | 3,000 00 |
| | | $340,178 25 |
| Removal of garbage, 1896 | | 40,000 00 |
| | | $380,178 25 |
| Harbor police | | 30,000 00 |
| Wharves and landings | | 10,000 00 |
| Commissioner of Public Works— | | |
| Commissioner's salary | | 3,500 00 |
| One chief clerk | $1,800 00 | |
| One book-keeper | 1,500 00 | |
| One assistant book-keeper | 1,200 00 | |
| One stenographer | 600 00 | |
| One porter and messenger | 480 00 | 5,580 00 |
| One general superintendent at $150 | 1,800 00 | |
| One general superintendent at upper district | 1,200 00 | |
| One general superintendent at lower district | 1,200 00 | |
| Seven district superintendents at $75 | 6,300 00 | 10,500 00 |
| Commissioners of Gentilly road | | 1,440 00 |
| Algiers roadkeeper | | 720 00 |
| One depot keeper | $720 00 | |
| Two depot keepers at $50 | 1,200 00 | 1,920 00 |
| Bridge keepers— | | |
| Nineteen bridge keepers at $50 | | 11,400 00 |
| Draining machines—Bienville draining machine— | | |
| One engineer | $1,000 | |
| Two firemen | 1,440 | $2,440 00 |
| Dublin avenue draining machine— | | |
| One engineer | 1,000 | |
| Two firemen | 1,440 | 2,440 00 |
| Melpomene draining machine— | | |
| One engineer | 1,000 | |
| Two firemen | 1,440 | 2,440 00 |
| London avenue draining machine— | | |
| One engineer | 1,000 | |
| Two firemen | 1,440 | 2,440 00 |
| Orleans pump— | | |
| One engineer | 1,000 | |
| Two firemen | 1,440 | 2,440 00 |
| Algiers | 120 00 | 12,320 00 |
| Street labor— | | |
| 150 men at $1.50 per day, for twenty-two days a month | | 59,400 00 |
| Bridge gang and pavers | | 8,581 75 |
| Lumber | | 5,000 00 |
| Removing garbage, 1897 | | 120,000 00 |
| Coal | | 10,000 00 |
| Total | | $250,311 75 |

From the foregoing it appears there is listed in the budget, among expenditures to be made in 1897, " removal of garbage, 1896, forty thousand dollars;" and also an additional sum for the Commissioner of Public Works, "removing garbage, 1897, one hundred and twenty thousand dollars; " that is to say the total proposed expenditures being one hundred and sixty thousand dollars for the removal of garbage.

But there is nothing that is applicable in terms to the claims of the relator, and it is to this state of things that the relator's *mandamus* and injunction are directed and seek to have amended.

The writ of *mandamus* was applied for and the preliminary order granted soon after the adertisement appeared, and soon afterward the two Ordinances Nos. 12,936 and 12,937, making appropriations in pursuance of the budget, were adopted *pendente lite*, and they provoked the relator's injunction.

The provisions of the ordinance and the corresponding provisions of the garbage contract, upon which the relator chiefly relies, as imposing upon the City Council the specific duty it seeks to compel compliance with, by means of the writ of *mandamus*, are the following, namely: .

" That the price which the city of New Orleans is to pay the said contractor for the services to be performed under said contract shall be divided into sixty equal parts for the first five years, and the same ratio shall be the basis of all payments to said contractor for each succeeding five years during the existence of the contract, so that payments shall be made monthly on the one-twelfth principle.

" Payments shall be made to the said contractor by warrant of the Comptroller on the Treasurer of the city of New Orleans; and the city of New Orleans *hereby binds and obligates itself to appropriate every year during the existence of this contract, in the annual budget of receipts and expenditures, the sum agreed to be paid said contractor each year.*"

Section 18 of Ordinance No. 7860, C. S.

And it further provides:

" That all ordinances and parts of ordinances in conflict with this ordinance be and the same are hereby repealed.

"Adopted by the council of the city of New Orleans, August 1, 1893." *Id.*, Sec. 19.

The provision of the charter of the city on the subject is as follows, viz.:

"That the council shall once in twelve months, before fixing and deciding upon the amount of taxes and licenses to be assessed for the ensuing year, cause to be made out a detailed estimate exhibiting the various items of liability and expenditures, including the requisite amount for all expenses during said year; and shall cause same to be published for at least ten days in the official journal of the city, and such rate of taxation as provided by law shall thereafter be fixed and assessed as, together with other revenues of the city, may be necessary to meet said estimated liabilities and expenditures. The *adoption* of said detailed estimates shall be considered as the *appropriation* of the amount stated for the purposes therein stated," etc.   Sec. 93 of Act 45 of 1896.

That section is an exact reproduction of Sec. 64 of Act 20 of 1882, the previous city charter, *ipsissimis verbis*.

From the terms of the foregoing ordinance, which is the foundation of relator's contract with the city, it appears that the method of making payments therein was specifically stipulated, and that the city bound and obligated herself " to appropriate every year during the existence of this contract, *in the annual budget* of receipts and expenditures, *the sum agreed to be paid said contractor each year;*" and from the provisions of the charter the necessary power is given to the City Council, and the corresponding duty is imposed upon them of making a budget of all expenses during each year, and to make the necessary appropriation therefor.

This contract does not contravene that provision of our statute which declares that " the police juries of the several parishes and the constituted authorities of incorporated towns and cities in this State shall not hereafter have power to contract any debt or pecuniary liability without fully providing in the ordinance creating the debt the means of paying the principal and interest of the debt so contracted."   Rev. Stat. 2448.

In New Orleans Gas Light Company vs. City of New Orleans, 42 An. 188, this court had under consideration and decided a similar question, the object of that suit being to annul a contract between the city and the Louisiana Electric Light and Power Company on that identical ground.

And in that case this court said:

" The obligation of the city for future disbursements in favor of the company is conditioned on the performance on the part of the

53

latter of its part of the contract, a fact to be ascertained under the terms of the contract itself, from month to month. Although the eventual disbursements to be made by the city may amount to several hundred thousand dollars it is certainly not correct to argue that the effect of the contract was to place it in debt to that amount.''

And in Snelling vs. Police Jury, 42 An. 886, this court affirmed a contract made by the defendant for the construction of a bridge, and for which they gave ten negotiable promissory notes; and in so deciding we held that police juries have the authority to contract for parochial improvements '' to be paid out of taxes which they are authorized to levy and which are to be set apart for this special purpose.''

And in Louisiana & Northwest Railroad Company vs. Police Jury, 48 An. 331, this court maintained as legal and valid, a police jury ordinance providing for the erection of a court house and accepting a bid from the contractors, the terms of which provided for payments in annual instalments and the same were to be discharged from the *future revenues* of the parish within the ten mill limitation.

Those decisions are sustainable upon like principles announced in Weston vs. City of Syracuse, 17 N. Y. 110, and Valparaiso vs. Gardner, 7 Amer. and Eng. Corp. Cases, 626.

So the bonds of the city which are issued to the relator are not only not impeachable on the ground stated, but they are made payable out of the current annual revenues of the city, and the city obliged herself in the ordinance and contract to place in her annual budget an amount sufficient to meet each one of the twelve monthly instalments thereof as they became due.

What this court said on the same subject in *Gas Light Co.* vs. City, *vide supra* is strictly applicable to the instant case, viz.:

'' As it appears from the stipulations hereinabove transcribed the city obligates itself to annually provide in its budget the means of discharging its pecuniary liability under the contract for each ensuing year.

'' How else could the city have possibly provided for the means necessary to pay for its annual supply of gas, or of any other needed and indispensable commodity, but out of its annual revenues and by means of a budget framed in accordance with the positive mandate of the law.

" We know of no other mode, and we have been referred to none."

As a matter of fact which appears on the budget, there is one hundred and twenty thousand dollars and forty thousand dollars, appropriated for the expense of garbage removal; and if relator has the right, by either *mandamas* or injunction, to coerce the city to keep to the specifications of her ordinance, the provisions of her contract, and those of her charter, there is enough of money appropriated to pay relator's demand and leave a surplus of forty thousand dollars in reserve for the city.

Not only is this true, but we find in the brief of the City Attorney the following distinct and emphatic statement, viz. :

" Since the adoption of Ordinance No. 12,537, the Department of Public Works has discharged the duty of collecting, removing and disposing of the garbage of the city of New Orleans, at an average monthly cost of seven thousand four hundred and thirty-one dollars." Brief, p. 7.

That ordinance was the one which declared relator's plant and its operation a nuisance, and it was adopted on the 30th of July, 1896; consequently, the purport of that admission is, that the city has only expended about seven thousand four hundred and fifty dollars per month, between that date and the date of the promulgation of the budget.

On that theory, the sum of about ninety thousand dollars should cover the amount of her expenditures for garbage removal during the year 1897, and leave a surplus of thirty thousand dollars applicable to the relator's contract independently of the forty thousand dollars, which is misappropriated to the deficit on garbage of 1896. These two items added, make a sum of seventy thousand dollars, which is in excess of the necessary expense of the city in the removal of garbage, *after she has been fully provided for*.

It is provided by statute " that the revenues of the several parishes and municipal corporations of this State, of each year, shall be devoted to the expenditures of that year; *provided,* that any surplus of said revenues may be applied to the payment of the indebtedness of former years." Sec. 3 of Act 39 of 1877.

That statute is particularly pointed out in the relator's petition for injunction, and applied to the two city ordinances, Nos. 12,936 and 12,937, approving the budget and making appropriations for the

expenses therein enumerated; and the prayer of relator is that *no moneys shall be therein appropriated to the prejudice of its mandamus, and that revenues, to be raised by taxation under an appropriation for 1897, shall not be diverted to indebtedness which was incurred in 1896, to the prejudice of its demands for and during 1897, in plain disregard of the law.*

The law is plain, and its attempted violation is clear. The remedy is sought, and it can be readily and easily supplied. Why should it not be done?

Not only does the budget call for the forty thousand dollars that is particularly specified for deficit of garbage expense for 1896, but it carries also the sum of ten thousand two hundred and forty-one dollars and twenty-five cents as an allowance to cover the expenses of an election in 1896. If this sum be applied to the relator's claim, the amount applicable thereto would be increased to more than eighty thousand dollars, not disturbing the amount to which the city is entitled to according to the statement of the city attorney.

Having made this elaborate statement of the relative position of the parties, and the facts and circumstances of this litigation, they must be tested by the law and jurisprudence in order to determine whether *mandamus* is the remedy for the enforcement of the relator's rights against the municipality.

After a very careful examination of all the authorities at hand, we have made the following analysis of them, viz.:

Mr. High, in treating "of mandamus to municipal corporations," says:

"*Mandamus* has been fitly termed the spur by which municipal officers are moved to the performance of their duty. And it may be affirmed as a general rule, sanctioned by the best authorities, that when a plain and imperative duty is specifically imposed by law upon the officers of a municipal corporation, so that in its performance they act merely in a ministerial capacity, without being called upon to exercise their own judgment as to whether the duty shall or shall not be performed, *mandamus* is the only adequate remedy to set them in motion, and the writ is freely granted in such cases, the ordinary remedies at law being unavailing. As illustrating the rule, it is held, that where county commissioners are required by a plain and positive statute to set aside a certain portion of the county funds annually for a specific purpose, and have refused to perform

this duty, they may be compelled to act by *mandamus.*" Citing
Humboldt Co. vs. Churchill Co., 6 Nev. 30; Hall vs. Selectmen of
Somersworth, 39 N. H. 511; *Ex parte* Common Council of Albany, 3
Cowan, 358; People vs. Common Council of New York, 45 Barb.
478; People vs. Collins, 7 Johns Rep. 549.

Again:

" So, when, under the statutes of the State it is made the impera-
tive duty of town authorities to appropriate and pay over a certain
percentage of the taxation of the town for the support of teachers'
institutes, the payment may be enforced by *mandamus*, there being
no other adequate remedy, by action at law or otherwise.·

"And where a board of municipal officers are required by law to
raise for the support of the poor, so much money annually as may
be fixed by another board, entrusted with the full power of deter-
mining the amount thus raised, the duty of raising the money may
be enforced by *mandamus*, there being no discretion left to the offi-
cers, and their duty being of a ministerial nature." High on Extra-
ordinary Legal Remedies, Sec. 324.

That author further says, in treating of *mandamus* as a means of
compelling " the auditing and payment of claims against municipal
corporations," the question, preliminarily, is " whether any other
legal and specific remedy exists, by an action at law, or otherwise,
adequate to afford relief to the party aggrieved. And the rule is too
firmly established to admit of doubt, or controversy, that, if there
be *any other adequate and specific remedy*, such as an action at law
against the corporation, by which relief may be had by the aggrieved
claimant, *mandamus* will not lie to compel municipal authorities or
their auditing boards or officers, either to audit or pay claims against
the corporation." *Id.*, Secs. 338 and 339.

But the author supplements that statement of the law by the fol-
lowing, viz.:

" *Where certain services are authorized by statute, and made a
charge against a county, mandamus* will lie to its board of super-
visors, requiring them to receive and allow a claim against the
county for the services thus rendered. Thus, when it is provided
by statute that medical services rendered for the indigent sick of a
county shall be made a charge upon the county, the duty imposed
upon the supervisors of allowing a claim for such services is treated
as an official duty, peremptory in its nature, which they are not at

liberty to disregard, and in the discharge of which they can not be permitted to follow their own caprices. *Mandamus* will therefore lie in such case to compel the performance of the duty." *Id.*, Sec. 350; People vs. Supervisors of Macomb County, 3 Mich. 475.

Another author says:

" A writ of *mandamus* will be granted against municipal corporations and their officers whenever they refuse or unreasonably neglect to perform *any duty clearly enjoined upon them by charter, or statute or law, and there is no other specific legal remedy adequate* to enforce the right of the public, or the specific legal right of the relator." Citing Hall vs. Selectmen, 30 N. H. 511; Hawkins vs. County Commissioners, 8 Conn. 243; Commonwealth vs. Allegheny Co., 32 Penn. St. 218; State vs. Kirkley, 29 Md. 85; Angel & Ames, Sec. 709; People vs. Supervisors, 10 Wendell, 363; State vs. Cincinnati, 19 Ohio, 178; State vs. Wood County, 17 Ohio, St. 184: Hall vs. Lappins, 3 Oregon, 55; Sidberry vs. Commissioners, 66 N. C. 486.

He quotes with approval the following passage by Judge Story, viz.:

" Whenever there is a clear legal right in the relator, a corresponding duty on the defendants and the want of other adequate and specific remedy a writ of *mandamus* is an appropriate process." 2 Dill n's Munic. Corp., Sec. 665; Commonwealth vs. Pittsburg, 34 Penn. St. 496.

The author further says:

" The well established general rule is, as above stated, that the writ of *mandamus* will only lie to give effect to a clear legal right, but if there be a reasonable doubt respecting the right of the public or of the relator to this form of remedy the writ will be granted and the question of the right considered on the return.

" And however clear the legal right of the relator or applicant for the writ may be, the writ can not be sustained if there is a clear, ample and adequate remedy by an ordinary action at law. *But since the proceeding by mandamus has been assimilated to ordinary proceedings*, the relator, if otherwise entitled, should not be denied a resort to this remedy on the ground that he can sue at law, unless it appears that this latter remedy is *just as adequate and effectual as the other.*" *Id.*, Sec. 667.

Now, it must be borne in mind, that under our Code of Practice *mandamus* is regarded as an *ordinary action* coupled with a demand

for a *special mode of relief.* This suit was filed in the Civil District Court and tried and decided there, and same was brought up to this court by appeal, and it must not be confounded with the writ of *mandamus* which this court exercises under its supervisory jurisdiction, which is *exclusively original.*

But that author is not only very full and concise in his treatment of the general rule with regard to the right to employ *mandamus* in dealing with a municipal corporation as a well recognized and established remedy, but he is equally as clear and just as emphatic in his treatment of the right to its employment " to *enforce duties toward creditors* " of a municipal corporation.

On this subject he says:

" *Mandamus* is one of the principal remedies by which municipal and public corporations are compelled *to perform their duties toward their creditors.* The power of the Legislature over these corporations is such that it may require them to levy a tax to pay creditors, and obedience to such requirement may be enforced by *mandamus.* The power of municipal corporations *to make contracts and to create liabilities* has been considered; and this authority *imposes the duty of providing for the payment of obligations and liabilities in the special mode prescribed by law,* and, if no such mode is prescribed, then by the levy and collection of taxes *under the provisions of the charter or legislative act. Whether the duty to provide for the payment of the liabilities of the corporation can be specially enjoined, or whether it results from the general powers and nature of the corporation, it may, in all proper cases, be eqally enforced by mandamus."* *Id.,* Sec. 685.    (Our italics.)    Citing Wakely vs. Muscatine, 6 Wallace, 481; Mayor vs. Lord, 9 Wallace, 409; Commonwealth vs. Allegheny, 32 Penn. St. 400; Maddox vs. Graham, 2 Metcalf (Ky.) 56; Lexington vs. Mullikin, 7 Gray (Mass.) 280; State vs. Milwaukee, 8 Wallace, 575; Galena vs. Amy, 5 Wallace, 705; Pigrom vs. County, 64 N. C. 557; Soutter vs. Madison, 15 Wis. 30; Flagg vs. Palmyra, 33 Mo. 440; Columbia Co. vs. King, 13 Fla. 451; Brown vs. Gugo, 32 Iowa, 496; State vs. Milwaukee, 25 Wisconsin, 122.

That this is the well established rule of interpretation in common-law States there can be no question, and it is bottomed upon the jurisprudence of the Supreme Court of the United States.

But with us the remedy by *mandamus* is statutory, and it is either an independent or an auxiliary one, as the case may be.

Our Code provides that "the object of this order is to prevent a denial of justice, * * * and it should therefore be issued in all cases where the law has assigned no relief by the ordinary means, and where justice and reason require that some mode should exist of redressing a wrong, or an abuse of any nature whatever." C. P. 830.

In Hatch vs. City, 1 R. 470, it was held that "under the Code of Practice the power of the courts of this State as to issuing writs of *mandamus* are more extensive than those of tribunals governed by the common law."

And this precept was adhered to and adopted in State *ex rel.* Barbin vs. Secretary of State, 32 An. 579.

And in State *ex rel.* Canal Company vs. City, 35 An. 68, this court affirmed what was said in Barbin vs. Secretary, and said: " We had occasion therein to show, upon the authority of previous decisions of this court, that the writ of *mandamus*, as provided by our Code, was broader in its scope and intendment than under the common law, and was not to be authoritatively construed by the adjudications under that system."

In City of Galena vs. Amy, 5 Wallace, 705, the court held that when the charter of a municipal corporation is authorized to levy a tax, *mandamus* was a proper remedy to enforce it. In the Board of Commissioners of Knox County vs. Aspinwall, 24 Howard, 376, it was held when the fund to pay the debt, "by the face of the contract, is a special tax laid and to be collected by the defendants, (and) they refuse to perform a plain duty, there is no other writ which can afford the party a remedy which the court is bound to afford, except that afforded by the writ of *mandamus*."

This class of cases has been frequently before this court and its course of treatment of it has been uniform and consistent.

For instance, in State *ex rel.* Carondelet Canal, etc., vs. Mayor and Administrators, 30 An. 129, the relator sought by *mandamus* to compel the respondents to make provision in the annual budget for the payment of a judgment, and the court said:

" By Sec. 124 of the act approved March 20, 1856, it was the duty of the government to provide in the annual budget, *for all matured debts and obligations of the city;* and the adoption of the budget was to be considered the appropriation of the amount for the purposes therein stated. This section of the act of 1856 is specially referred to and recognized in the second section of Act 5 of 1870 as being still in force.

"It was, therefore, the plain duty of the Mayor and administrators to have provided in the next annual budget   *   *   *   for the pay-ment of the judgment, etc.   *   *   *

" This plain duty they had failed to perform.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

" But the duty still remained of providing for the payment in the *only* mode by which judgment creditors of the city are permitted to collect their judgments.   This required the action of the Mayor and administrators, in their aggregate capacity as a municipal govern-ment; the adoption of the annual budget; the levy of the necessary taxes, and the setting apart of a sufficient amount to pay this and all other registered judgments.

" Perfect as the right of relator is to have provision thus made for the payment of its judgment, there is no reason or process by which it can be enforced otherwise than by *mandamus.*   The duty of the city to make this provision is not discretionary either as to time or the manner.   The law imperatively requires that it shall be in the *next* annual budget, and by setting apart, appropriating a sufficient amount out of the annual revenues.   The duty of the Mayor and administrators is plain and the right of the relator is absolute.

This is the same identical remedy that the relator in the instant case is seeking.   The same provision of law that was relied upon in that case is found in the city charters of 1882 and of 1896, and is invoked herein.

Instead of a judgment for a matter of ordinary indebtedness of the city, the relator has bonds of the city evidenced by an ordinance of the city enacted in pursuance of her charter and the general laws of the State in reference to the removal of garbage, in which she specifi-cally bound herself to place the amounts annually due, in her budget and make an appropriation therefor—thus presenting the plain ministerial duty of the city in its strongest possible light.

This case was followed and affirmed in the following cases viz.:

State *ex rel.* Carondelet Canal Co.  vs. Mayor, 30 An. 705; State *ex rel.* Marchand vs. City, 37 An. 13.

But in State  *ex rel.* De Leon vs. City of New Orleans, 34 An. 477, there was presented and decided the identical question we have now under consideration.

The court in the opening sentence, speaking through MR. JUSTICE FENNER, said:

" This is a *mandamus* proceeding by the relator, as holder of the bonds of the city of New Orleans, issued under Act 49 of 1869, to compel the city administrators to comply with the provisions of section three thereof, by providing for the payment of the interest coupons falling due in 1882, and in subsequent years."

In speaking of the terms in which the judgment appealed from was couched, the court said:

" The judgment appealed from commands the respondents to include in the estimates of receipts and expenditures to be adopted by them for 1882 * * * appropriations sufficient to meet and pay the interest upon the bonds held by the relator," etc.

And in speaking of relator's remedy by *mandamus*, said:

" The city contends, however, that this remedy, as far as it and its officers are concerned, has been taken away by subsequent legislation, to-wit: by Act 5 of 1870.

" The performance of the duties referred to is certainly a vital obligation of relator's contract.

" The *only* remedy afforded by the law to enforce performance of this obligation was the writ of *mandamus*, and if that remedy has been taken away, it is evident that there exists to-day, in the remedial system of our law, no remedy whatever for the enforcement of this specific obligation of the contract."

But the court entertained a contrary opinion, and affirmed the judgment making the *mandamus* peremptory.

The same principle was announced and applied in State *ex rel.* Bauman vs. Judge, 38 An. 43.

In State *ex rel.* Barber Asphalt Company vs. City, 40 An. 299, this court said:

" The brief for rehearing entirely misconstrues our original opinion in assuming that we held that Act 5 of 1870 operates as a bar to a judicial enforcement by *mandamus* * * * of the performance of specific duties imposed by subsequent legislation upon the city of New Orleans, its Common Council, or any of its officers. The contrary has been too frequently affirmed by this court to be longer a subject of controversy." Citing numerous cases.

The same principle was announced in State *ex rel.* Fernandez vs. City, 45 An. 1389.

It has been frequently held by the Supreme Court that a municipal ordinance levying a tax was a *law of the State* in the sense of the

constitutional provision relative to the impairment of the obligation of contracts; and in New Orleans Waterworks Company vs. Louisiana Sugar Refinery Company, 125 U. S. 18, they said: " A by-law, or ordinance of a municipal corporation may be such an exercise of legislative power delegated by the Legislature to the corporation as a political subdivision of the State *having all the foree of law* within the limits of the municipality that it may be properly considered as law," etc.   Merriweather vs. Grant, 102 U. S. 472; Home Insurance Company vs. City, 93 U. S. 116.

In Murray vs. Charleston, 96 U. S. 432, the court stated emphatically, that "when city ordinances are passed under the supposed authority of a legislative act *their provisions become the law of the State.*"

The garbage ordinance was authorized by various acts of the Legislature appertaining to that subject, viz.: Act 14 of 1877, Extra Session; Act 40 of 1882, and Act 94 of 1888.

The proposition on the part of the city made in that ordinance to dispose of the garbage franchise at public auction was a legal and proper one, and her charter imposed the duty upon her to see to it that garbage was removed from her streets as a sanitary regulation. This duty was likewise imposed in the Constitution and the general law with reference to the exercise of the police power.   In that ordinance she bound herself to provide in the annual budget for the monthly instalments of the price she agreed to pay the garbage company, and her charter in mandatory terms required her to prepare an annual budget of all expenses and disbursements.

The case of the relator is a strong one and the plain ministerial duty of the City Council is clear.

But notwithstand'ng this concurrence and weight of adjudication in favor of the exercise of the writ of *mandamus* for the purpose of compelling municipal corporations to perform their plain ministerial duties to their creditors in making provisions for their payment, yet the contention of the City Attorney is that it can not be resorted to for the purpose of enforcing a contractual duty—that is to say, the specific performance of a contract.

But it is error to say that this is a proceeding for the enforcement of a contract.   Such is not the case which is presented by the petition or the return.   On the contrary, it is most distinctly a proceeding exclusively directed against the city's annual budget of expenses

and appropriations for the year 1897, and the only claim made by the
relator is that the City Council has failed to perform a plain minis-
terial *duty* which is set forth in the eighteenth section of the garbage
ordinance to the effect that "the city of New Orleans hereby binds
and obligates itself to appropriate every year during the existence
of this contract in the annual budget of receipts and expenditures
the sum agreed to be paid said contractor each year."

And which duty is further imposed and emphasized by the provi-
sions of the city charter in the following specific terms, viz.:

"That the council *shall* once in twelve months, before fixing and
deciding upon the amount of taxes and license for the ensuing year,
cause to be made out a detailed estimate, exhibiting the various
items of liabilty and expenditures, including the requisite amount
for *all expenses during the year*," etc.—the adoption of which shall
be considered an appropriation of the amount stated *for the purposes*
therein stated.    Sec. 93 of Act 45 of 1896.

The only relief demanded by the writ of *mandamus* is that the City
Council shall place relator's claim upon the budget of expenses for
the sum of one hundred and twenty thousand dollars, to cover the
company's expense in the removal of garbage for the current year,
and include same in the appropriation therefor; and the only relief
by injunction is, to preserve the *status quo* pending the *mandamus*
proceedings, so that the ordinances approving the budget and appro-
priation *after the preliminary writ of mandamus had been granted*,
should not become final and irrevocable, and the revenues there-
under arising be disbursed, and relator's recourse thereupon defeated
and destroyed.

Such a proceeding is altogether dissimilar from the specific per-
formance of a contract to do or not to do; but it is one for the com-
pulsory performance of a plain, ministerial duty.

It is just such a proceeding as that of State *ex rel.* De Leon vs.
City, *supra*, and State *ex rel.* Carondelet Canal, etc., vs. Mayor, *supra*.

In such a case no question of the *performance* or *non-performance*
of contract can be determined; and it was upon this specific ground
that the judge *a quo* rejected all such evidence, and which rulings
seem to have been acquiesced in.    The city ordinance declaring re-
lator's plant and its method of garbage removal to be a nuisance
does not dispose of the legal right of relator in the premises, nor was
it intended to have that effect; for we have the admission in the

record and in the argument that it was made the foundation *only* of the subsequent action of the city in undertaking the removal of garbage through its department of public works, not as a basis of proceedings for the forfeiture of the contract of the city with the fertilizing company. It is quite impossible to conceive of the city's course of dealing with its contract creditors having the *legal* effect of absolving her from the performance of a plain, ministerial duty to them, or to place the relator in the position of suing for the specific performance of her contract—same *being perfect, intact and unassailed* and the company in full possession of the garbage district of the city.

Not only so, but the contract of the *city* is one for the payment of a certain, definite sum of money from the annual revenues of the year 1887, to be raised by taxation.

But, under the express provision of our Code, specific performance is an element of the contract to do, or not to do, for they declare, viz. :

" On the *breach* of an obligation to do or not to do, the *obligee* is entitled either to damages, or in cases which permit it, to a specific performance of the contract, at his option, or he may require the dissolution of the contract," etc. (Our italics.) R. C. C. 1926.

It is apparent from a casual inspection of that language that the demand for the specific performance of a contract to do or not to do must be preceded by a *breach* of it on the part of the *obligor*, and such breach entitles the *obligee* in the contract to sue the *obligor* for the specific performance of it, or for its annulment and the consequent damages.

It is manifest that this suit is not for the specific performance of a contract at all, (1) because it is not instituted by the *obligee* in the contract, which is made *the* essential requisite by the Code; (2) the engagement of the *city* is neither to do or not to do; (3) there is no breach of contract alleged, but a default of the obligee in carrying out its terms; and (4) it proceeds in the *affirmance* of the contract, seeking to obtain its avails, and keep same in force *in futuro*.

Relief by compelling specific performance is just the reverse of this proceeding in every essential particular.

Had the city, in pursuance of her nuisance ordinance, taken the initiative by instituting suit for the revocation of her contract with the fertilizer company, or to compel full compliance with its con-

tract by removing garbage, she would have presented a case of specific performance under the Code, possibly. The contract of sale furnishes frequent illustrations of this principle; and to make the application let us take the case of Citizens Bank vs. James, 36 An. 267, wherein specific performance was demanded of an intending purchaser, and of which the court said:

" The bank asks that the defendant should be compelled to comply with the terms of his contract. It is not in our power to force him to do so "—that is, to *purchase* the property. " The penalty he incurs for violating it is the damage he has occasioned."

In the contract under consideration what did the city oblige herself to do? Nothing but to pay relator for the removal of garbage from the streets the price stipulated in her ordinance and contract. They contain *no other alternative obligation* of any kind.

The contract of the city was one to give. ●R. C. C. 1899.

Having refused or failed to pay, what damages can be awarded against her? None except the interest which results from her default " in the performance of an obligation to pay money." R. C. C. 1935, 1936. But the situation is relieved of any difficulty by comparing the article last cited with a subsequent article which declares, viz.:

. " Where the object of the contract is *anything but the payment of money*, the damages due to the creditor for its violation are the amount of the loss he has sustained and the profit of which he has been deprived of," etc. R. C. C. 1934.

But even applying to this case the principles of specific performance, they lack application, because the *respondent* is a *municipal* corporation *non sui juris*. It would be an altogether different situation confronting us if the *respondent* were a *private* corporation or a private individual, and the city were the relator, as in State *ex rel.* The City of New Orleans vs. The New Orleans & Carrollton Railroad Company, 37 An. 589, upon which the City Attorney relies. In that case the city, as *relator*, sought by a writ of *mandamus* to compel the respondent to proceed at once to *repair a certain street of the city*, and the obligation sought to be thus enforced was one of the stipulations in a contract of sale.

The writ was refused, and properly.

State *ex rel.* City of New Orleans vs. New Orleans & Northeastern Railroad Company, 42 An. 138, was a similar case. State *ex rel.* McEnery vs. Nicholls, Governor, 42 An. 222, and State *ex rel.* City

of New Orleans vs. New Orleans & Carrollton Railroad Company, 44 An. 1026, are of the same tenor and purport.

It is conspicuous that in each of those cases the city of New Orleans was *relator;* but in none of those cited was she respondent. And it is confidently believed that no such case can be found, in which the city was *respondent.*     But there is still another principle of more controlling force in interpreting the relator's remedy against the municipality, and that is, that the agreement between the parties is not a *contract in the ordinary acceptation of the term*—the subject matter of this mutual agreement being the removal of garbage from the streets of the city, under municipal regulations in respect to the exercise of the police power of the city.

The city ordinance proposing and founding the engagement, primarily, rests upon the following legislative enactments, viz.:

Act 14 of 1877, Extra Session.

Act 40 of 1882.

Act 94 of 1883.

In Macon vs. Shawneetown, 77 Illinois, 535, the court said:

" The ordinance can not, we think, be treated as a *mere contract* between the city, as proprietor of the land on which the right of way is granted, and the railroad company, to which no one else is privy, and under which no third person can derive immediately any private right, prescribing conditions of the grant, to be enforced only by the city itself.     Although it takes the form of a contract, provides for its acceptance and contemplates a written agreement in execution of it, it is also, and primarily a *municipal regulation*, and as such, being duly authorized by the legislative power of the *State*, *has the force of law within the limits of the city.*"

This extract from the opinion of the Illinois court was quoted with approval by the Supreme Court in Hays vs. Michigan Central Railroad Company, 111 U. S. 228.

For the enforcement of such a contract or engagement *against* the city, *mandamus* is the proper remedy.     But if it be held that the relator has not that right, what other adequate and sufficient remedy is there remaining to the relator?

In Abascal vs. City of New Orleans, 48 An. 365, we held the holders of floating debt certificates were not entitled to recover absolute money judgments against the city.

To the same effect are the following cases, viz.: Johnson vs. City,

46 An. 714; Newgass vs. City, 42 An. 169; Paving Company vs. City, 43 An. 464; Bermudez vs. City, 45 An. 1389; Same vs. Same, 46 An. 1130.

If the *mandamus* be refused the ordinances approving the budget as it now stands and making the appropriations of the revenues of the current year to the payment thereof, become absolute and irrevocable, and there will not remain a single farthing which will be applicable to the payment of relator's claims. And in case its claim for monthly allowances for the removal of garbage is denied it virtually becomes a floating indebtedness which can not be reduced to judgment, with no possible revenue to meet it, save and except any surplus there may be in any future year over and above the current expenditures. In State *ex rel.* Fazende vs. City, 35 An. 221, the court held that *mandamus* would not lie to compel the municipal authorities to place a sum on the budget *after* the appropriation had been made to the expenditures therein specified; and in State *ex rel.* Samory vs. City, 34 An. 460, the writ of *mandamus* to compel the city authorities to provide for and set apart a sufficient amount of the revenues to pay the interest on the relator's bonds was refused because the appropriations in the budget had exhausted the city's limit and power of taxation. This theory finds ample illustration in our opinion in State *ex rel.* Foy vs. Mayor, No. 12,405.

If this result be reached, it will, of course, be out of the question for the relator to continue the operation of its large and expensive plant, as it will be deprived of the revenues which the ordinance and garbage contract make applicable thereto. This result should not be brought about by the decree of this court unless it is made *absolutely necessary by the inexorable demands of the law;* particularly in view of the fact that the budget carries an allowance for *garbage alone, which is seventy thousand dollars in excess of all the requirements of the department of public works, for the collection and removal of garbage for and during the entire year 1897.*

And in view of the fact—one that is worthy of serious consideration—that the judge *a quo* rendered judgment in favor of the relator and made the *mandamus* peremptory, the relator's claim to relief is greatly strengthened; as a decree of the court below is entitled to consideration and weight, and particularly in cases when the determinative questions of law or fact are closely or nearly equally balanced.

And that consideration and weight are increased and strengthened by the strong equities that are in favor of the relator's demand, as well as the fact that the city budget carries an appropriation largely in excess of the city's needs for the removal of garbage for the current year. To permit such an interpretation to be placed upon relator's right in the premises would be equivalent to the divestiture of its vested rights, which we said in the Wolf case could not be done at the whim, the caprice, or the dissatisfaction of the council.

The *mandamus* proceeding of the relator having been filed and the preliminary writ having been issued to and served upon the Mayor of the city immediately after the budget was published, it had the legal effect of staying matters in that condition until the right to a peremptory writ was judicially determined. The subsequent adoption of city ordinances approving and making the budget final had a like effect as the homologation of an administrator's account so far as not opposed; it did not affect the status of the claim of relator to have the budget allowance for garbage so adjusted, judicially, as to meet its requirements. In that respect the budget is open to investigation and restatement, just as an administrator's account which has been opposed.

Consequently there is no legal obstacle to the adjustment of the budget so as to make it conform to the relator's demands.

In conclusion, there is but one word to be said about the city's right to have relator's injunction dissolved on bond, and that is that by thus suspending the injunction, its effect would have been destroyed—the city being dispensed from giving bond in all cases.

The object of the *mandamus* is to compel the City Council to apply the amount of one hundred and twenty thousand dollars already appropriated in the budget for garbage removal to its demands, and that of the injunction is to restrain them from diverting or misapplying this fund when created to any other purpose—thus protecting the relator in its franchise and contract rights.

This case is easily distinguished from that of State *ex rel.* Florville Foy vs. Mayor and Council of New Orleans, No. 12,405, just decided, and the authorities cited therein. *Mandamus* was claimed in that case on the authority of Sec. 2 of Act 5 of 1870, Extra Session, to compel the respondents " *to budget a sufficient amount*" to pay and satisfy the relator's two judgments for money, which had been

54

rendered against the city in previous years—the budget containing no provision of any kind for the payment of judgments.

The following is the city's return:

"Relator is the owner of two judgments against the city of New Orleans, on which there remains unpaid a balance of two thousand and fifty-five dollars and ninety-four cents.

"He applied to the lower court for a *mandamus* to compel the Mayor and Council to budget in the general budget for 1897 the amount necessary to pay his judgment. This application was made December 7, 1896, and the writ was made returnable on December 21, 1896. The budget was adopted on December 16, 1896. The return to the writ was filed on December 21, 1896, and stated for reason why the *mandamus* should be refused:

1. That relator's petition disclosed no cause of action.

2. That the budget for 1897 had already been adopted, and all the revenues for 1897 disposed of by the same, and that the appropriations made for specific purposes can not be diverted from those objects for any cause whatever, but remain sacred to the objects of the appropriation.

3. That the budget of 1897 exhausts all the revenues of that year, as named in said budget.

4. That it is the duty of the Council to estimate the receipts and expenses in preparing the annual budget, and after it has done so, in the exercise of its discretion, its action can not be reviewed in a *mandamus* proceeding.

5. That relator's demand is an ordinary money demand, and he is limited in his action against the funds and taxes and collections of the particular year during which the obligations which form the basis of his judgment were created.

6. That the city can not legally apply the taxes of 1897 for the payment of any other expenses than those of 1897.

And the respondent pleaded a general denial.

The provisions of the act on which the relator relied are to the effect, that the comptroller of the city was required to warrant upon the treasurer for the amount due upon any registered judgment without any special appropriation, if there was sufficient money in the treasury to pay same specially designated for that purpose in the annual budget; otherwise, the statute provided, " that the Common Council *shall have power, if they deem proper, to appropriate from the*

*money set apart in the budget, or annual estimate for contingent expenses,* a sufficient sum of money to pay said judgment; but if no such appropriation be made * * * then all judgments shall be paid in the order in which they shall be filed and registered * * * *from the first money next annually set apart for that purpose.*"

On the face of the statute, *the duty was purely discretionary;* and no claim was made by the relator that there is, in the budget for 1897, *any money in the contingent fund* that is applicable to his judgments.

The city can not be permitted to exclude the garbage company from the garbage fund that has been appropriated, and apply it to her own use in direct violation of her contract.

This controversy may be epitomized as one for the *control of an existing appropriation* in the annual budget for garbage removal during the current year 1897, the relator claiming under its contract, and the city claiming it for itself, disavowing its contract.

It is evident that both are not entitled to collect garbage; and hence, both are not entitled to be compensated for performing the service.

The right of no third person is involved; and the budget having been approved by the council since the preliminary writ of *mandamus* was served, it has become final and conclusive, in all *other* respects than that of the garbage appropriation.

No readjustment of the budget is contemplated in respect to any other claim which is carried on the budget. No *increase* of garbage allowance is demanded; and no increase in the total appropriation is demanded. If the *mandamus* is made peremptory, the city will be necessarily excluded from *use* of the garbage fund when realized by the department of public works; and if it be denied the garbage, company will be forced to discontinue its collection altogether.

If the city is kept to her contract it won't require the fund, and she has the correlative right to coerce relator's performance of duty *under* it.

Evidently the city has not the right summarily to displace a contractor in the manner proposed; and it is equally evident that it can be coerced to perform the plain ministerial duty of budgeting relator's claim as provided in the ordinance and as required by law.

It is manifest, from the face of the record, that the writ should be made peremptory (1) because garbage must be removed immediately

in order that the health of the inhabitants of the city may not be endangered; (2) because the department of public works is dumping garbage on the vacant lots and squares of the city, to the detriment of the public health, and into the Mississippi river in front of the city, in contravention of a criminal law of the United States, and (3) because the relator has a sufficient force and the means of removing garbage in possession, and a plant in full operation, adequate for the purpose of *removing* and *disposing* of garbage without either dumping same on vacant squares or in the Mississippi river.

And observing the rule of law "that courts of justice will generally take notice of whatever ought to be generally known within the limits of their jurisdiction" (Glf. Ev., Sec. 6), we will take notice of the fact that such a disposition of the case will be in keeping with recent recommendations which the Secretary of War has made on upon the subject to the mayor of the city, since the submission of this case.

Entertaining these views, the *mandamus* should be made peremptory.

BLANCHARD, J., concurs in this dissent.